**GERRISH CORPORATION, et
al., Plaintiff,**

v.

**UNIVERSAL UNDERWRITERS INSUR-
ANCE COMPANY KANSAS CITY,
MISSOURI, Defendant.**

**Civ. A. No. 89–19.**

United States District Court,
D. Vermont.

Dec. 5, 1990.

As Corrected Dec. 7, 1990 and
Jan. 4, 1991.

Robert E. Manchester, Manchester Law Offices, Burlington, Vt., for plaintiff.

Karen McAndrew, Dinse, Erdmann & Clapp, Burlington, Vt., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

PARKER, District Judge.

## I. INTRODUCTION

In this Declaratory Judgment action, plaintiff, Gerrish Corporation (hereinafter "Gerrish or plaintiff") seeks a declaratory judgment, declaring that a liability insurance policy ("the Policy") issued by Universal Underwriters Insurance Company (hereinafter "Universal, or defendant") to Gerrish, provides coverage for a petroleum pollution clean-up claim, asserted against Gerrish by the State of Vermont on May 2, 1985. Universal opposes plaintiff's petition and requests that the Court issue a declaratory judgment that the Policy does not provide coverage for plaintiff's claim. The case was tried to Court commencing October 24, 1990.

## II. FINDINGS OF FACT

*Jurisdiction and Venue*

1. This action is filed under the Federal Declaratory Judgments Act, 28 U.S.C.A. § 2201 (West Supp.1990).

2. Plaintiff, Gerrish d/b/a/ Woodstock East, d/b/a Gerrish Motors and d/b/a/ Scrub–A–Dub is a Vermont Corporation with a principal place of business in Woodstock, Vermont.

3. Defendant, Universal is a stock insurance company with its principal place of business in Kansas City, Missouri. Universal is licensed to engage in the business of selling insurance in the State of Vermont and has, for at least twenty years, submitted its insurance forms and rates for approval to the Vermont Department of Banking and Insurance and sold policies in Vermont.

*Background*

4. Plaintiff is the owner of a shopping center in Woodstock, Vermont, known as "Woodstock East". Kurt Gerrish (a shareholder of Gerrish) has owned a portion of the realty on which Woodstock East sits, since 1963 and obtained the rest of the property in fee simple on May 29, 1967. Mr. Gerrish conveyed all the property he owned, consisting of 7 acres, to Gerrish on May 29, 1968. The portion known as Woodstock East is approximately 4.8 acres.

5. Plaintiff has developed the Woodstock East property since 1968 and the property now includes approximately 15 retail stores and 8 apartments. Plaintiff also operates two other businesses on the property, one of which is Gerrish Motors, an automotive dealership, and Scrub–A–Dub, a car wash and retail petroleum sales facility. Scrub–A–Dub and Gerrish Motors are corporate divisions of Gerrish. Scrub–A–Dub sold petroleum products at retail to customers of Gerrish Motors and others.

6. During 1972, Woodstock Structures, Inc. installed oil storage tanks at Woodstock East as a part of Scrub–A–Dub's retail sales business. Retail sales began during November 1972 and over the next year in excess of 75,000 gallons of petroleum were sold.

7. During November, 1973, Scrub–A–Dub discovered that approximately 4,785 gallons of gasoline had been lost due to either a gasoline spill or theft.

8. The tanks were air pressure tested to determine whether the tank system might be faulty. The tanks were thereafter excavated and a tank thought to be leaking was replaced. At that time, it was determined that the leak was actually caused by a cracked pipe fitting, which was also replaced. (Plaintiff's Exhibit 13—an invoice for the fitting repair.) The tanks themselves had no evident leaks.

9. On September 8, 1975 Gerrish settled a claim against Woodstock Structures, Inc., the contractor for the gas island for Scrub–A–Dub, and Wyman, Inc., a subcontractor, for the then known damage resulting from the gas leak. Gerrish received $2,085.96 for the value of the lost gasoline product and released Woodstock Structures and Wyman from damages it sustained. (Plaintiff's Exhibit 65.)

10. The settlement did not include any payment for pollution clean-up. Between the date of settlement and May 6, 1985, when Gerrish received the State's Pollution Claim, Gerrish had no knowledge that pollution contamination had resulted from the gasoline spill.

11. From the time of the gas spill in 1972–73 until this claim arose, there have been no material changes to the subsurface structure of the Woodstock East property except for the installation of a "French drain" in 1981 or 1982. The "French drain" is an underground drainage line which drains the property, in part, into a tributary of the Ottauquechee River.

12. On May 31, 1984, Gerrish leased its Woodstock East premises to Woodstock East Associates (a Vt. limited partnership) for a term of five years with an option to purchase. The option to purchase has not been exercised. Gerrish continues to hold title in fee simple to the leased property. (Plaintiff's Exhibit 69.)

13. On May 31, 1984, Gerrish also entered into other leases with Woodstock East Associates, leasing back a portion of the premises. Gerrish thereby retained ownership, possession and control of the Scrub-A-Dub facilities, including the gasoline islands, tanks, piping and underlying land. (Plaintiff's Exhibit 68.)

*Pollution Claim by Agency*

14. On May 2, 1985, the State of Vermont through the Agency of Environmental Conservation, ("Agency") notified plaintiff that Woodstock East was the source of petroleum pollution which was entering a "natural drainage stream" which "empties directly" into the Ottauquechee River. The migration of the material was considered hazardous. Pursuant to Vermont Statute, the Agency gave notice that the State would investigate to determine the magnitude and extent of the petroleum pollution and take appropriate steps to minimize the harm to the public and the environment. Prior to the expenditure of State funds, the

State notified plaintiff as a potentially responsible party that it could voluntarily take corrective measures under Agency direction to alleviate the pollution hazard. (Plaintiff's Exhibit 2.)

15. The State in its notice says that Marvin Wolf owns the property on which both businesses (Gerrish Motors and Scrub–A–Dub) are located. This statement is simply erroneous.

16. Although there have been other minor petroleum spills on the property over the years, the pollution giving rise to this claim is in all likelihood a result of the 1972–73 spill and the Court so finds.

17. Prior to the receipt of the State's Pollution Claim, Gerrish had no knowledge of any subsurface pollution contamination of the Woodstock East property resulting from the 1972–73 spill, and no one had asserted any claim for clean up or damages against Gerrish due to pollution contamination. Gerrish had no intention to clean up any subsurface pollution before the Agency's Pollution Claim arose.

18. On June 11, 1985, Gerrish demanded that Universal be responsible for all costs involved in monitoring and cleaning up the source of the pollution under the terms of a Universal insurance policy, No. 428584D, which had been issued to Gerrish with a policy period of September 1, 1984 to September 1, 1985. (Plaintiff's Exhibit 2A, copy of the letter from Philip Johnson to Universal.) (Plaintiff's Exhibit 1, the Policy.)

19. Universal agreed to investigate the State's Pollution Claim under a reservation of Rights/non-waiver agreement dated June 18, 1985. (Plaintiff's Exhibit 4.)

20. Thereafter, Ground Water Technology, Inc. (GTI) was hired jointly by Aetna Insurance Co. (which provided coverage to a lessee of part of the premises) and Universal to investigate the pollution contamination.

21. Universal now maintains that it is not responsible to Gerrish under the policy for any damages for environmental cleanup incurred as a consequence of the State's Pollution Claim, and refuses to reimburse Gerrish for its expenses. (Plaintiff's Exhibits 17, 18, 19 and 20.) (See defendant's answer in this case.)

22. Pollution presently exists as a plume of petroleum product (dissolved hydrocarbons in groundwater) which is located in the subsurface strata of the Woodstock East property. It has migrated to an adjacent property of the Marble Bank as well as into the right of way for a public highway (Route 4). GTI Dec. 1988 Rprt. (Plaintiff's Exhibits 14, 14(k), 14(*l* ) and charts.)

23. In addition to the pollution plume in the subsurface of the property, there are two areas of seepage of petroleum product into a tributary stream of the Ottauquechee River. One is near the opening of the "French drain", which is on the north-westerly corner of the Woodstock East property. The other point of seepage is on the west side of Route 4, on property not owned by Gerrish. (Plaintiff's Exhibit 66.) At these seepage areas, GTI has installed "collection boxes" in which both dissolved and free-phase hydrocarbons have been collected.

*The Insurance Policy*

24. The prototype of what Universal calls its Unicover III insurance policy, which is at issue here, was first approved by the Vermont Department of Banking and Insurance (VDBI) on May 19, 1980. Attached to the policy that was then approved was a Vermont State Amendatory Part (Edition 4–80). (Defendant's Exhibit A, pp. 289–291.)

25. Gerrish's Universal Unicover III Motor Vehicle Dealers policy was issued with the Vermont State Amendatory Part attached. (Edition 9–83.) (Plaintiff's Exhibit 1, p. 5.)

26. The pertinent coverages in the instant case are Part 500 Garage Liability; Part 950 General Liability and Part 980 Umbrella coverage.

27. INJURY under all these Parts includes: "bodily injury, sickness, disease, or disability ... or damage to or loss of use of tangible property."

28. The Gerrish 1984–85 Unicover III policy, (like the 1980 prototype), Part 500 Garage Coverage contained the following exclusionary language:

Exclusions—This insurance does not apply to:

. . . . .

(m) INJURY caused by the dumping, discharge, or escape of irritants, pollutants or contaminants. This exclusion does not apply if the discharge is sudden and accidental;

(n) INJURY caused by the discharge, release, or escape of any petroleum substance into or upon any body of water or water course, regardless of the nature of the discharge, release, or escape (whether accidental or not). . . .

29. Part 950 General Liability Coverage contained the same exclusionary language, labelled (e) and (f) in that Part. The Umbrella Part 980 also included the same provisions, labelled (g) and (h).

30. The Vermont State Amendatory Part of the policy, as issued, deleted exclusions pertaining to pollution and contamination for any "AUTO insured by this policy and licensed or principally garaged in, or used for GARAGE OPERATIONS in Vermont:

Coverage Part 500–GARAGE INSURANCE: (m) and (n)

Coverage Part 900–BASIC AUTO INSURANCE: (g)

Coverage Part 980–UMBRELLA: (g) and (h)."

31. The Vermont State Amendatory Part made no deletion with respect to pollution from any source other than an insured automobile, and no deletion of any kind was made of the pollution exclusionary language contained in the general liability coverage part.

32. As defendant points out, the original Unicover III specimen policy was revised numerous times by filings with the VDBI between the first filing in May, 1980 and the effective date of the Gerrish policy in September, 1984. (Defendant's Exhibits C–Q.) None of those revisions pertained to the pollution exclusions or the Vermont State Amendatory Part.

33. In addition to the previously referenced pollution exclusions, the Gerrish policy has two exclusions in the General Liability Part 950 that are pertinent to the issue of coverage in this case:

Exclusions—This insurance does not apply to:

. . . . .

(k) INJURY to property owned by, rented or leased to, used by, or in the care, custody or control of the INSURED. . . .

(l) INJURY to premises after YOU transfer ownership or possession to another, if INJURY is caused prior to the transfer.

(Plaintiff's Exhibit 1.)

34. The Gerrish Universal policy as issued to the insured was in its pertinent parts, an "Occurrences" policy, providing coverage only for losses arising from injuries *occurring* during the policy period. (Plaintiff's Exhibit 1.)

35. Between its May 2, 1980 initial filing of its Unicover III policy and an April 1, 1985 filing which contained a certain pollution endorsement, (No 322), Universal *itself* did not make any filing with the Department which altered, amended or deleted the above-referenced exclusionary language.

*Insurance Services Organization*

36. Universal is a member of the Insurance Services Organization ("ISO"). ISO is an umbrella rating organization, which is owned by a number of insurance companies. ISO provides various services to its members and subscribers including drafting and filing of insurance forms with state insurance departments, which it can do on behalf of its member companies if given authority by the members to do so.

37. Universal has filed ISO Filing Authorization forms with the VDBI. The latest authorization bears the effective date of October 1, 1982 and remained effective at all times pertinent to this litigation. (Plaintiff's Exhibit 6.)

38. The ISO authorization form gives ISO express authority to act on Universal's

behalf before the Department of Banking and Insurance. The authorization indicates that ISO has the authority to file "rates, rules, [and] forms" in several areas of insurance, including "general liability" insurance, with the VDBI on behalf of Universal, a "MEMBER or SUBSCRIBER of the INSURANCE SERVICES OFFICE."

39. The only exception to this authority, reserved by Universal is in the area of "personal auto" insurance. There is no exception in the ISO Authorization form filed by Universal pertaining to General liability or pollution exclusions for any states or Vermont specifically. (Plaintiff's Exhibit 6.) (Defendant's Exhibit DD.)

40. Universal's ISO Filing Authorization Form states that "[t]his Filing Authorization shall be deemed amended to the extent that any filing is made in your office directly by the undersigned company and is inconsistent with the filing of said Insurance Services Office."

*The History of the Pollution Exclusion*

41. The Vermont Department of Banking and Insurance has changed its position at various times, as to whether insurance companies may exclude pollution coverage from their general liability policies.

42. From the mid 1970's through the end of 1982, the VDBI did not approve policies containing a pollution exclusion. This was merely Departmental policy; no regulation addressed this issue. Nevertheless, the Department did not "*knowingly* approve any form that contained any pollution exclusion unless a companion mandatory endorsement deleted that exclusion." (Feb. 8, 1990 letter of Paul Candage, Senior Insurance Analyst, VDBI, to Robert Manchester, Plaintiff's Exhibit 22.) During that time, form GL 01 11 (Edition 01–73) was the contamination or pollution exception endorsement used in Vermont.

43. Late in 1982, ISO filed a pollution liability policy for use by its members and subscribers, but did so on the VDBI's agreement to withdraw form GL 01 11. VDBI accepted a withdrawal of GL 01 11 as of January 1, 1983. Hence, the VDBI once again allowed pollution exclusions be-

cause it believed that separate pollution policies were available in Vermont.

44. Later in 1983, however, VDBI learned that the pollution liability policy was not widely available and therefore told ISO that VDBI intended to withdraw approval of the pollution liability policy and to effectively reinstate form GL 01 11 pursuant to Vt.Stat.Ann. tit. 8, § 3541(c) (1984).

*ISO 1984 Filing*

45. Negotiations over the pollution coverage issue between ISO and the VDBI resulted in ISO's April 30, 1984 filing. This filing provided for a Vermont Pollution Liability exception Endorsement GL 01 54. (Plaintiff's Exhibit 9.) The Endorsement deleted the pollution exclusion and provided coverage for sudden and non-sudden pollution incidents on a modified claims-made basis subject to an aggregate limit.

46. Under Endorsement GL 01 54, "a claim ... shall be deemed to have been made when written notice of such claim is received by the *insured* or by the company, whichever comes first."

47. The definition of "property damage" under the GL 01 54 Endorsement includes, in part "physical injury to or destruction of tangible property...."

48. In addition to Endorsement GL 01 54, the April 30, 1984 ISO filing provided for two Pollution Exclusion Endorsements, GL 21 31 and GL 21 32, for cases where there was a "recognized hazard." For insureds with recognized pollution hazards, the exclusions would totally negate pollution coverage on a "risk by risk" basis, if the insured either purchased a separate pollution liability policy or the insurer filed an Individual Risk Filing with VDBI. (Plaintiff's Exhibit 9.)

49. The April 30, 1984 filing stated that "these changes are applicable to *all policies* written on or after July 1, 1984." (Emphasis added.) (Plaintiff's Exhibit 9.)

50. After July 1, 1984, the VDBI allowed the equivalent of GL 01 54 (the ISO form) to be attached to policies issued in Vermont as long as the pollution exclusions were deleted. (Paul Candage letter to Rob-

ert Manchester, February 8, 1990, Plaintiff's Exhibit 22.)

51. At the time ISO made its April 30, 1984 filing, ISO was authorized to act as Universal's agent by virtue of the October 1, 1982 filing with VDBI.

52. The VDBI approved ISO's April 30, 1984 filing on May 2, 1984.

53. In a June 4, 1984 Circular, ISO notified all of its members that the Vermont Contamination and Pollution Endorsement GL 01 11, which previously deleted the pollution exclusion in the General Liability Policy, was withdrawn. Members were informed that a new Vermont contamination or Pollution Exception Endorsement (GL 01 54) had been developed which provided coverage for sudden and non-sudden pollution incidents on a claims-made basis subject to an aggregate limit.

54. The Circular stated that these changes were applicable to all policies written on or after July 1, 1984 and that GL 01 54 *"must* be attached to *all* policies providing general liability coverage in Vermont unless the coverage is specifically excluded." (ISO June 4, 1984 Circular, p. 2, Plaintiff's Exhibit 7.)

55. Universal received a copy of the ISO Circular on July 9, 1984. (Plaintiff's Exhibit 11.)

56. On an interoffice memorandum dated August 9, 1984, in reaction to the June 4, 1984 ISO Circular, Bob Oakes, a Universal Vice President, wrote, "we have no choice—these endorsements are MANDATORY. Also, we can't delete them or charge for the coverage without the Insured's permission.... How do you propose we get around this?" (Written notes between Al Birch and Bob Oakes on Plaintiff's Exhibit 11, p. 7.)

57. The ISO Circular notified its members that Universal had to contact the Department before July 1, 1984 if Universal wanted to either have a different effective date or decided not to use the ISO endorsement form. Members of ISO were *not* required to file anything with the VDBI to use the new forms and effective date. Universal did not notify VDBI regarding a different effective date or any desire not to use the ISO form.

58. Universal made no contact or filing with VDBI between the time of its receipt of the ISO Circular and the time of plaintiff's receipt of the State's Pollution Claim on May 6, 1985, pertaining to pollution coverage, except for an April 1, 1985 filing.

*Universal's 1985 Filing*

59. On April 1, 1985, Universal submitted to the VDBI a proposed form of endorsement for its two Unicover III policies (Motor Vehicle Dealers and Automotive Parts Dealers). This filing is the first filing by Universal *itself* pertaining to pollution exclusions since the original filing of the prototype Unicover policy in May, 1980. The endorsements, Nos. 322 (Auto, Truck and Motorcycle Dealers) and 322P (Parts Dealers) would provide coverage for "sudden and non-sudden pollution incidents on a claims-made basis."

60. The claims-made provision of Endorsement 322 would change the policy from an occurrence type policy to a claims-made policy. In other words, the "occurrence" provisions of the policy covered incidents occurring during the policy period regardless of when the claim was made. Under the new endorsement, "[a]ny claim shall be deemed to have been made when written notice of such claim is received by the INSURED or US, whichever comes first."

61. On May 12, 1986, Universal filed Endorsement No. 400 Pollution Exclusion with VDBI. This endorsement excluded pollution coverage entirely under any Universal policy to which it was attached:

This policy shall not apply to any INJURY arising out of the actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants; or to any loss costs or expense arising out of any governmental direction or request to monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants.

(Plaintiff's Exhibit 5, p. 756.) The VDBI initially disapproved Endorsement 400 on June 27, 1986, stating that VDBI "did not allow the Pollution Hazard to be routinely excluded. Pollution coverage must be *pro-*

*vided* unless excluded by means of an Individual Risk filing submitted to this Department *each time* it is attached to a policy." (Defendant's Exhibit S, p. 740.)

62. In response to the Department's disapproval, Universal drafted Endorsement 402, which was the same as Endorsement 400 except for the addition of a place for the insured's acknowledgement. Universal assumed that if the insured signed and Universal filed the endorsement with VDBI, such an Endorsement would meet the requirements of an Individual Risk filing. (Defendant's Exhibit S, p. 739.)

63. On September 23, 1986, the VDBI disapproved Endorsement 402 even with the space for the insured acknowledgement. The VDBI explained that it needed Universal's agreement that the endorsement would "*not* be attached to every policy, even with the insured's signature. It may be used *only* when there is a *recognized exposure* which must be described to this Department." (Defendant's Exhibit S, p. 738.)

64. On October 13, 1986, Universal explained to the VDBI that virtually all of their accounts had some "recognized pollution exposure" as most had underground fuel tanks and therefore, Universal was in a position of having to exclude coverage. (Defendant's Exhibit S, p. 742.)

65. On November 5, 1986, the VDBI approved Endorsement 402 provided that whenever the pollution hazard is excluded, an Individual Risk filing must be made with the Department. Underneath the form, Ed Mason (a Vice President of Universal) made a notation on November 13, 1986, that says "[t]his *means* we send a copy of the 402 signed by the Insured to the Vt. Insurance Dept." (Defendant's Exhibit S, p. 734.)

### CONCLUSIONS OF LAW, OPINION AND ORDER

This is a declaratory judgment action in which plaintiff, Gerrish Corporation, seeks a declaration that a liability insurance policy issued by defendant, Universal Underwriters Insurance Company, provides coverage for a petroleum pollution clean-up claim asserted against plaintiff by the State of Vermont on May 2, 1985. Defendant opposes plaintiff's petition and requests a declaration that the policy does not provide coverage for plaintiff's claims.

The underlying facts are that plaintiff owned property in Woodstock, Vermont, which contained gasoline storage tanks used in connection with a retail gasoline sales operation. Certain plumbing associated with those tanks leaked petroleum products in 1972, or 1973, which petroleum has migrated since that time off plaintiff's property to at least one adjacent property. Petroleum contamination is also bleeding into a stream, which is a tributary of the Ottauquechee River.

In May of 1985, the State of Vermont through its Agency of Environmental Conservation, notified plaintiff that the Agency had determined that a petroleum product emanating from plaintiff's property is entering a natural drainage stream, which empties into the Ottauquechee River. The State also expressed its intention to investigate and mitigate the situation and seek to recover the costs from responsible parties. At the same time, the State offered plaintiff the opportunity as a potentially responsible party to take its own steps toward investigation and mitigation.

Plaintiff received the notification on May 6, 1985 and on June 11, 1985 transmitted its demand to defendant that it should take responsibility for all costs of monitoring and cleaning up the contamination under the terms of the insurance policy at issue in this case, which policy was in effect at the time the claim was made.

Defendant originally investigated the claim under a reservation of rights and eventually denied coverage altogether, claiming that the policy provided no coverage for this type of contamination because of the application of various exclusions in the policy.

Plaintiff acknowledges that the policy as issued contained certain exclusionary language, but contends that: (a) the exclusions do not apply to the injury which occurred in this case, or (b) that the exclu-

sions have been deleted by an amendment to the policy, which was effective July 1 of 1984, or (c) that an amendment to the policy occurred in May of 1985, which provides coverage for plaintiff's claim.

This Court rejects plaintiff's contention (a) and holds that the language of the policy as issued excluded coverage. There is no need to reach plaintiff's contention (c) in view of the Court's holding with regard to contention (b), which is, that an amendment to the policy did occur on July 1st of 1984, which amendment applies to the policy which issued in September, 1984, and which provides coverage for the precise claim made by plaintiff in this case.

This Court has diversity jurisdiction over this declaratory judgment action pursuant to 28 U.S.C.A. § 1332(a)(1) (West Supp. 1990).

■ We will first discuss defendant's view that there are general exclusions in the policy which defeat coverage regardless of the existence or non-existence of specific pollution exclusions.

Universal contends, in part, that coverage under the policy is excluded by exclusions (*l*) and (k) in the general liability coverage part.

Exclusion (*l*) provides that there is no coverage for: "INJURY to premises after YOU transfer ownership or possession to another, if INJURY is caused prior to the transfer." In fact, although Gerrish leased to another entity at one point, it immediately leased back and has maintained ownership, possession and control of the property from which the pollution emanates throughout the time when the pollution occurred and through the time when the claim arose during the policy period. Accordingly, exclusion (*l*) under the General Liability Coverage Part 950 is inapplicable.

Exclusion (k) negates coverage for "INJURY to property owned by, rented or leased to, used by, or in the care, custody or control of the INSURED...." Defendant urges that this exclusion applies because the contamination in this case originates on plaintiff's property and constitutes damage to that property.

■ Vermont law provides that policy terms in an insurance contract should be interpreted consistent with the purpose of providing coverage, therefore, limitations and exclusions should be strictly construed. *City of Burlington v. Glens Falls Ins. Co.,* 133 Vt. 423, 424, 340 A.2d 89, 90 (1975).

In this case, the "Injury" (damage to property) from pollution includes not only damage to the Gerrish property, but also includes potential damage to adjacent landowners including the Marble Bank and present damage to a stream, which runs to the Ottauquechee. We hold that the claim giving rise to this case encompasses injury to property not owned by the plaintiff. Exclusion (k) excludes injury to property owned by the insured. It might be necessary to do remedial work on the insured's property in order to stop injury to the property of others. The cost of such on premises remedial work, as well as any off premises remediation, is not excluded by the language of exclusion (k).

■ The State of Vermont has the authority to regulate pollution contamination of groundwater and the waterways and can recover clean-up costs. Vt.Stat.Ann. tit. 10, §§ 1283, 1390–1410 (Supp.1990).

Defendant contends that clean-up costs or "response costs" in response to State Agency action under Title 10, Section 1283 of the Vermont Statutes are not "damages" under the policy. In the beginning of the General Liability Coverage Part, the policy states that the Insurer "will pay all sums the INSURED legally must pay as damages ... because of INJURY." The policy also provides that Universal has a "duty to defend any suit asking for these damages." The question is whether clean-up costs constitute legal damages or are remedial and restorative and therefore only equitable in nature. This Court finds that clean-up costs constitute damages within the meaning of the policy. Legal authority on this issue is split and there are no Vermont cases on the issue.[1] However, partic-

1. Cases holding that environmental clean-up costs or response costs are covered under a

ularly in light of *Avondale Indus. Inc. v. Travelers Indem. Co.*, 887 F.2d 1200 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990) (New York law), this Court believes that the Vermont Supreme Court would find that pollution clean-up costs are damages under the policy in this case, and we so hold.

In *Avondale*, Avondale Industries was sued by neighboring property owners for personal injury and property damage caused by pollutants (petroleum products and chemical compounds), emanating from a dump site in Louisiana. Avondale's insurance policy had similar pollution exclusions to plaintiff's policy. Avondale was sued by private individuals near the dump site and received a "demand" letter from the Louisiana State Department of Environmental Quality demanding that Avondale submit a plan for remedial action at the site and informing Avondale that it was a potentially responsible party.

The Second Circuit found that the insurer was obliged to defend Avondale in private litigation and in the public administrative proceeding. The Court also held that "damages" included "remedial costs that may be imposed on Avondale by the State of Louisiana." 887 F.2d at 1207. The Court expressed concern with public interest and the prompt cleanup of the hazardous waste and mentioned a report that found that private remedial effort was quicker and less expensive than a government sponsored program. *Id.* at 1206.

Furthermore, the Vermont Supreme Court has found that in a property damage case: "[I]f the injury is temporary in the sense that restoration can cure the harm, the reasonable cost of repair may serve the need and provide adequate and fair compensation." *Bean v. Sears, Roebuck & Company*, 129 Vt. 278, 282, 276 A.2d 613, 616 (1971). *Bean* involved a suit where plaintiffs sued defendant for faulty installation of an oil furnace which resulted in pollution of the water supply on plaintiff's farm.

■ Under Vermont law, language in an insurance policy must be given its plain and ordinary meaning. *Kusserow v. Blue Cross–Blue Shield Plan of N.H.–Vt.*, 140 Vt. 328, 333, 437 A.2d 1114, 1117 (1981). Black's Law Dictionary (5th ed. 1979) defines "damage" as

Loss, injury, or deterioration, caused by the negligence, design, or accident of one person to another, in respect of the latter's person or property. The word is to be distinguished from its plural, "damages", which means a compensation in money for a loss or damage.

The policy defines "INJURY" as "damage to ... tangible property." Environmental contamination is an injury or damage to tangible property and the monetary damages (clean-up costs) that flow from that property damage are recoverable as damages Gerrish legally must pay.

■ Even if this Court were to determine that the term "property damage" becomes ambiguous when considering environmental contamination (which it does not), ambiguities in an insurance contract must be construed in favor of the insured. *Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. 496, 500, 536 A.2d 914, 916 (1987). ("Ambiguity in policy language should be resolved in favor of the insured since the insurer is in a far better position to avoid

general liability policy include: *Ray Indus. Inc. v. Liberty Mut. Ins. Co.*, 728 F.Supp. 1310, 1314 (E.D.Mich.1989); *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 174 (M.D. Pa.1989), *order amended by*, 738 F.Supp. 896 (M.D.Pa.1990); *National Indem. Co. v. United States Pollution Control Inc.*, 717 F.Supp. 765, 766–67 (W.D.Okla.1989); *Intel Corp. v. Hartford Accident and Indem. Co.*, 692 F.Supp. 1171, 1186–93 (N.D.Cal.1988); *New Castle County v. Hartford Accident and Indem. Co.*, 673 F.Supp. 1359, 1365–66 (D.Del.1987); *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 398–400 (D.N.J.1987). Cases finding clean-up or response costs are not covered damages include: *Maryland Casualty Co. v. Armco Inc.*, 822 F.2d 1348, 1352–54 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (Maryland law); *Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979, 980–81 (4th Cir.1988) (South Carolina law); *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir. 1986) (Response costs are not property damages under CERCLA); *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 449–50 (D.Kan.1990); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 950, 954–55 (N.D. Ill.1988).

**368**

latent ambiguity in the text of the policy.") (citing *Town of Troy v. American Fidelity Co.*, 120 Vt. 410, 417, 143 A.2d 469, 474 (1958)).

■ We now turn to what we have earlier called plaintiff's contention (a), that is, that the language of the policy as it was originally issued provided coverage.

The Universal policy as it issued to plaintiff effective September 1, 1984 contained exclusions attached to both the garage coverage (Part 500) and the general liability coverage (Part 950) stating that the insurance in each of those parts did not apply to:

> INJURY caused by the dumping, discharge, or escape of irritants, pollutants, or contaminants. This exclusion does not apply if the discharge is sudden and accidental; ...

> INJURY caused by the discharge, release, or escape of any petroleum substance into or upon any body of water or water course, regardless of the nature of the discharge, release, or escape (whether accidental or not)....

There is a developing body of law concerning the meaning of "sudden and accidental" in this type of case (*See*, 7A J. Appelman, Insurance Law and Practice § 4499.05) (Berdal ed. 1979 & Supp.1990). However, we need not address that issue since the exclusion barring recovery for injury caused by a discharge "into or upon any body of water or water course" applies in this instance. The very reason for this claim is the escape of a petroleum substance into a tributary of the Ottauquechee River. Accordingly, we hold that the policy as initially issued excluded coverage on that basis.

■ The crux of the dispute in this case, however, is whether the policy as written controls plaintiff's claim, or whether instead an amendment to the policy existed which provided coverage at the time the claim was made. To resolve this dispute, we must first look at the April 30, 1984 filing by Insurance Services Organization (ISO) to determine whether it impacts the Gerrish policy.

At the time of the April 30, 1984 filing, ISO was authorized to act as Universal's agent by the October 1, 1982 filing with VDBI. ISO had the authority to act on behalf of its member insurers under Vermont law. Vt.Stat.Ann. tit. 8, § 3541(a) (1984). ("[T]he filing required by this subsection may be made by rating organizations on behalf of its members and subscribers; but this provision shall not be deemed to prohibit any such member or subscriber from filing any such forms on its own behalf.") (*See also* VDBI Regulation V–(D), Plaintiff's Exhibit 50, p. 2.)

The April 30, 1984 filing by ISO was applicable to policies written on or after July 1, 1984 and, quite clearly, was intended to delete any pollution exclusions and provide coverage for both sudden and non-sudden pollution incidents, in all policies to which the filing applied, on a claims-made basis. In other words, if the ISO filing applied to policies written by Universal on or after July 1, 1984, it would provide pollution coverage to any claims arising during the policy period for which the Company received a notice of claim. In this case, since the plaintiff's policy period was September 1, 1984 to September 1, 1985 and the claim arose in May of 1985, with notice given to the Company in June of 1985, pollution coverage exists if the ISO amendment is applicable to the Universal policy.

Universal contends in this litigation that the ISO filing is not applicable to its policy for the reasons that: (1) the Gerrish policy is part of what the Company characterizes as its Unicover III Program, which it maintains is independent of anything that ISO may have done and was, therefore, immune from any impact of the April 30th filing; (2) the ISO filing could not apply because the language of that filing would be ambiguous if one attempted to incorporate it into the Unicover III policy (it does not fit the "structure" of the policy); (3) it had no actual knowledge of the VDBI policy prohibiting pollution exclusions at that time and no knowledge of the ISO filing; and (4) VDBI had no power to implement such a policy without doing so through the Administrative Procedures Act requiring notice and comment by insurers. Addressing

each of defendant's arguments in order, we rule as follows.

Universal certainly could have isolated its Unicover III policy from the impact of any ISO filings by notifying the VDBI that it was doing so. In fact, VDBI Regulation 81–03, Section XII provides that:

> [A]ny insurer not electing to adopt a rating organization filing shall be considered as having adopted an independent filing on its own; and is, thereafter, individually subject to Vermont's statutory and regulatory filing requirements. Furthermore, such an insurer must *inform the Department in writing* that its filing authorization with the rating organization has been so changed.

(Plaintiff's Exhibit 50, p. 10 (emphasis added).)

Also, VDBI Regulation 81–03, Section VIII provides for "Exception" filings and states that an insurer who has authorized a rating organization to file on its behalf "may submit exceptions to that filing authorization for Departmental consideration in connection with any insurance program, rule, rate(s), policy, form and/or line of insurance...." (Plaintiff's Exhibit 50, p. 7.)

Further, Universal could have indicated on its ISO filing authorization form that it reserved an exception to the filing authorization covering the Unicover III policy, or the entire Unicover Program much as it did except from the authorization any coverages concerning personal auto. (Plaintiff's Exhibit 6.) Furthermore, Title 8, Section 3451(a) of the Vermont Statutes specifically reserved the right to Universal (and all other insurers) to modify, amend, withdraw or otherwise limit the authority, which it granted to ISO. Universal did none of these things. Universal seems to contend, however, that the VDBI should have concluded that its Unicover III policy was not to be amended by ISO filings because Universal itself had historically done independent filings in connection with the Unicover policy. Universal's position would impose an obligation on the Department to somehow limit the authority of ISO on the basis of an historical practice, which the Depart-

ment should have guessed at in the face of the clear written authority which existed for ISO to make filings on behalf of its members and specifically on behalf of Universal except with regard to personal auto insurance. This is simply not a sound position for the Company to take.

Universal's second contention is that the 1984 ISO filing could not apply because to do so would create ambiguities. In fact, there was no ambiguity in the *language* of the ISO filing, which stated: "On behalf of our member and subscriber companies, we hereby enclose the captioned revision". (Note there is no reservation with regard to any member.) And later "these changes are applicable to all policies written on or after July 1, 1984." (Once again, no reservation as to the policies to which coverage would apply.) Further, on a page headed *"Contamination or pollution exception* (Vermont)," the filing provides: "It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is deleted." Later, on a page referring to general liability coverage, the following language appears:

### CONTAMINATION OR POLLUTANTS EXCEPTION ENDORSEMENT
#### GL 01 54

Attach Contamination or Pollution Exception Endorsement GL 01 54 to all policies issued in Vermont providing general liability coverage. This endorsement affords coverage for sudden and non-sudden pollution incidents on a claims-made basis, subject to an aggregate limit.... This endorsement is to be attached without charge unless written application for a charge, with the consent of the insured is made to the Commissioner pursuant to the requirements of the Vermont Statutes.

The filing and the endorsement language are clear and unambiguous and could certainly have been attached to the Universal Unicover III policy as an endorsement, which would eliminate the pollution exclu-

sion provisions contained in the general liability part of that policy.

There *is*, however, reference in the ISO filing to amendments to provisions entitled "Coverage A–Bodily Injury Liability" and "Coverage B–Property Damage Liability". Those coverages (A and B) did not exist in the Unicover III policy at the time, suggesting to Universal that at least that part of the filing could not apply to its policy and would have been rejected by VDBI, if filed by Universal.

■ That may be, however, the filing was not by Universal. It was by Universal's agent "on behalf of our [ISO's] member and subscriber companies ..." to be "applicable to all policies written on or after July 1, 1984." (Plaintiff's Exhibit 9, ISO 1984 filing.) Universal, of course, is bound by the acts of its express agent done in furtherance of the agency. *Young v. Lamson*, 121 Vt. 474, 476, 160 A.2d 873, 875 (1960); *see also Costa v. Volkswagen of Am.*, 150 Vt. 213, 215 n. 1, 551 A.2d 1196, 1197 n. 1 (1988), *overruled on other grounds, Gochey v. Bombardier, Inc.*, 572 A.2d 921 (Vt.1990); Restatement (Second) of Agency § 140 comment a (1958) ("principal is subject to liability upon a transaction conducted by [its] agent"). Whatever ambiguities may have been created by Universal's agent certainly can not be applied to the detriment of Universal's insured. In any event with regard to the general liability section of the policy, there was no ambiguity whatsoever.

Universal also contends that the language of endorsement GL 01 54, if applicable would only delete exclusion (e) of the policy (injury caused by dumping pollutants) and not exclusion (f) of the policy (release of petroleum substances into streams). We are at a loss to determine why this should be the case. The language of the filing says that "the exclusion relating to the discharge ... of liquids or gases, ... contaminants or pollutants is deleted." The endorsement applies with equal impact to both exclusions.

■ Universal's third argument is that it had no knowledge of the VDBI policy, which during the time period from July 1, 1984 until the present, required pollution coverage in all policies either by deleting exclusions, or attaching the equivalent of the ISO form GL 01 54 providing pollution coverage on a modified claims-made basis except in individual risk or "risk by risk" situations. (Plaintiff's Exhibit 22.) Universal also contends that it had no knowledge of the ISO April 30, 1984 filing.

In fact, it is abundantly clear that *ISO* was well aware of the VDBI policy regarding pollution exclusions. In fact, during the late 1983 and early 1984 time period, ISO engaged in extensive negotiations with VDBI over that very issue, ultimately resulting in the April 30, 1984 filing. For purposes of dealing with VDBI, ISO had an agency relationship with Universal. Accordingly, even if Universal had no actual knowledge of the Department policy, it is charged with constructive knowledge of the information, which was known to ISO. *See Estate of Sawyer v. Crowell*, 151 Vt. 287, 291, 559 A.2d 687, 690 (1989); *Solomon v. Design Dev., Inc.*, 143 Vt. 128, 131, 465 A.2d 234, 236 (1983).

Any contention that Universal was unaware of the ISO action has even less merit. Plaintiff's exhibit 11 is a circular dated June 28, 1984 sent by ISO to Universal clearly disclosing the filing and all of its particulars along with various Universal documents reacting to the information. The circular

> announced the approval of Vermont contamination or pollution exception endorsement GL 01 54. This endorsement provides coverage for sudden and nonsudden pollution incidents on a claims-made basis subject to an aggregate limit.

The circular also indicates "that these changes were applicable to *all* [emphasis added] policies written on or after *July 1, 1984.*" It goes on to state that:

> If you have authorized us to file on your behalf and decide:
>
> .     .     .     .     .
>
> *not* to use this revision, you should notify the Vermont Insurance Department prior to our effective date [which is July 1, 1984].

An inter-office memorandum from Ed Mason (Vice President of Universal) dated August 9, 1984 notifies Bob Oakes (another Universal Vice President) that:

[a]s I read this they [referring to ISO] are requiring an endorsement providing coverage for "sudden and non-sudden pollution incidents on a claims-made basis subject to an aggregate limit."

(Plaintiff's Exhibit 11, p. 7.) Al Birch of Universal, in a handwritten note to Bob Oakes and Ed Mason on the same memorandum, expressed his wish not to convert to claims-made coverage because "[i]t would be inconsistent with GL & represents some negative future implications." Mr. Oakes' handwritten reply was: "Al— we have no choice—these endorsements are MANDATORY. Also, we can't delete them or charge for the coverage without the insured's permission. We're even required to write it on a claims first made basis. How do you propose to get around this?"

Despite the circular, Universal did not "notify the Vermont Insurance Department prior to [or after the] effective date that it had decided not to use the revision". This Court holds that the provisions of the April, 1984 ISO filing and specifically endorsement GL 01 54 became a part of all Universal policies issued in Vermont after July 1, 1984 until June 21, 1985, when Universal's Unicover III Endorsement 322 was approved by VDBI.

The coverage provided by the April 30, 1984 filing became a part of the coverage provided to Gerrish even though the language was not included in the policy as issued by virtue of Title 8, Section 3541 of the Vermont Statutes and the CONFORMING TO LAW provision of the policy. Section 3541 prohibits issuance of a policy in Vermont, until the form has been approved by the Commissioner. Upon approval, the ISO endorsement deleted the pollution exclusion language in Universal's General Liability coverage. In order to conform to law then, the policy provided coverage by deletion of the exclusions. As a matter of law, Universal was required to provide the coverage once the ISO filing had been approved as to all general liability policies issued in Vermont after July 1, 1984.

Defendant also contends that any obligation, which it might have to provide pollution coverage in this case, arose as a result of an unauthorized or *ultra vires* policy of the Vermont Department of Banking and Insurance. Universal contends that VDBI had no authority under the statutory scheme existing in Vermont, to impose a departmental policy such as existed in this case, namely, that at various periods of time the VDBI would not approve policies which did not provide pollution coverage, or which excluded such coverage in all instances. Since the Department did not go through the procedures set out in the Vermont Administrative Procedures Act for the adoption of Regulations, it is contended that no authority existed. This position on the part of Universal ignores the natural impact of the authority the Department *did* have under Title 8, Section 3541 of the Vermont Statutes, which gives the Commissioner of Banking and Insurance the authority to either approve, or disapprove forms of coverage which are to be sold to insureds in the State of Vermont. If the Department decides as a matter of policy that it will not approve certain types of coverage, or exclusions (for example policies containing pollution exclusions), it need not wait for filings and reject them on a policy by policy basis. As a practical matter, the sensible approach, and the approach that the Department took in this case, was to let it be known what it intended to do with regard to filings pertaining to pollution coverage so that the insurance industry could react and negotiate with the Department as to the type of form which would be approved for use in Vermont.

In any event, the argument that this action was *ultra vires* is of no avail to defendant in this case. Universal's agent (ISO) voluntarily negotiated with the Department and ultimately decided to file endorsement GL 54 01, which provided pollution coverage in general liability policies. Since ISO chose to take that approach and Universal is bound by ISO's actions on its behalf, Universal's suggestion that the De-

partment acted outside of its authority is of no avail. A challenge to the Department's authority was available to defendant, or to ISO, prior to ISO's filing. In fact, a statutory hearing process was available for that purpose, but not at this late date.[2]

Having determined that ISO's April, 1984 filing provided pollution coverage to plaintiff, it is not necessary for the Court to rule on plaintiff's argument that Universal's 1985 amendment to the Unicover III policy provides coverage for this claim. Therefore, we make no ruling in that regard.

On the basis of the foregoing opinion, the Court issues the following ORDER:

The language of endorsement GL 01 54 is incorporated into the general liability section of Universal Underwriters Insurance Company policy number 428584D issued to the plaintiff Gerrish Corporation. The provisions of that endorsement afford coverage under the policy for the claim made by plaintiff in June of 1985 in response to the Vermont Agency of Environmental Conservation communication to Kurt Gerrish dated May 2, 1985. The property damage coverage referred to in endorsement GL 01 54 and the "INJURY" to property provisions in the general liability insurance coverage part of the Universal policy cover the clean-up costs asserted by the Vermont Agency of Environmental Conservation as well as the costs of investigation and defense of that claim. Any environmental harm to the State's waterways, which has arisen, or may arise out of this claim, constitute "damage to or loss of use of tangible property" under the policy. Coverage is provided for Gerrish under both the general liability part 950 and the umbrella part 980 of the Universal policy.

**2.** Vt.Stat.Ann. tit. 8, §§ 3541(b), (c) (1984).